**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 14, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ANA PATRICIA MONTES,
NELY DAVILA, MARGARITA
ERAZO, EVA ESCOBEDO,
ERNESTO GARCIA, WILLIE MAE
HOPKINS, ELIZABETH
JARAMILLO, and MERVYN D.
VARGAS, on behalf of themselves
and all other interested and similarly
situated parties,

      Plaintiffs-Appellants,

and

JOSEFA C. DIAZ, and ANGELICA
NUNEZ, on behalf of themselves and
all other interested and similarly
situated parties,

      Plaintiffs,

v.

VAIL CLINIC, INC.,

      Defendant-Appellee,
and

SERVICEMASTER MANAGEMENT
SERVICES LIMITED
PARTNERSHIP,

      Defendant.

No. 05-1385

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 01-CV-1250-RPM-CBS)**

David Sandoval, Sandoval Law Firm, Santa Fe, New Mexico, for Plaintiffs-Appellants.

Andrew M. Low (Janet A. Savage and Catherine L. Guzelian, with him on the brief), Davis Graham & Stubbs LLP, Denver, Colorado, for Defendant-Appellee.

Before **LUCERO, MURPHY,** and **GORSUCH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

Eight former employees of the Vail Clinic, Inc., a hospital in Vail, Colorado, appeal the district court's grant of summary judgment to the Clinic on their Title VII claims. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII" or the "Act"). With respect to five of the appealing plaintiffs, we conclude that they fail to establish, as they must, the timeliness of their claims. With respect to the remaining three plaintiffs, we are able to address the substance of their appeal but, like the district court, conclude that they have not adduced facts from which a reasonable jury could find a violation of Title VII. On these bases, we affirm.[1]

---

[1] Two other individuals who were plaintiffs in the district court are not before us in this appeal – Josefa C. Diaz elected not to appeal and Angelica

(continued...)

I

Summary judgment follows when a moving party points to the absence of factual support on an element essential to the non-movant's case, and on which the non-movant bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The Clinic argues that the plaintiffs in this case have failed to present record evidence sufficient to suggest that they filed timely Title VII charges with the federal Equal Employment Opportunity Commission ("EEOC"), and that proof of such a timely charge is a condition precedent to bringing suit. Viewing the facts in the light most favorable to plaintiffs and the parties' legal arguments *de novo*, *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1249 (10th Cir. 2006), we are constrained to agree with respect to five of the eight plaintiffs before us.

A

An employee wishing to challenge an employment practice under Title VII must first "file" a "charge" of discrimination with the EEOC. 42 U.S.C. § 2000e-5(e)(1); *Ledbetter v. Goodyear Tire & Rubber Co.*, __ U.S. __, 127 S. Ct. 2162, 2166-67 (2007). Because Title VII seeks to avoid "the pressing of stale claims," it requires aggrieved persons to file any such charge within certain specified periods after the allegedly unlawful conduct occurred. *Zipes v. Trans*

---

[1](...continued)
Nunez was dismissed from this litigation prior to our decision.

*World Airlines, Inc.*, 455 U.S. 385, 394 (1982) (quotation omitted). If the employee does not submit a timely EEOC charge, he or she may not proceed to court. *Ledbetter*, 127 S. Ct. at 2166-67. While the applicable deadline for filing a charge with the EEOC depends on a variety of circumstances, the latest possible filing date is 300 days after the last allegedly unlawful act. *See* 42 U.S.C. § 2000e-5(e)(1).

Here, the last alleged violation of Title VII for each plaintiff coincided with his or her termination date.[2] And the undisputed facts reveal that five of the eight plaintiffs before us (Nely Davila, Margarita Erazo, Willie Mae Hopkins, Elizabeth Jaramillo, and Mervyn Vargas), filed their charges with the EEOC more than 300 days after their respective terminations. Under our precedents and those of the Supreme Court, this combination of facts would seem to require dismissal of the claims of these particular plaintiffs. *See Holmes v. Utah, Dep't of Workforce Servs.*, 483 F.3d 1057, 1061-62 (10th Cir. 2007) (dismissing allegations which did not occur within the 300 day filing period); *see also Ledbetter*, 127 S. Ct. at 2166-68.

Specifically, the record before us reflects that most of the plaintiffs departed the Clinic between November 1998 and May 1999; beginning approximately six months later, on November 3, 1999, and proceeding at various

---

[2] None of the plaintiffs has alleged any Title VII violation after his or her termination in the form, say, of unlawful retaliatory conduct.

- 4 -

dates through April 2000, they filed sworn charges with the EEOC. The

following chart summarizes the exact dates on which each plaintiff was

terminated and filed his or her charge with the EEOC:[3]

| Plaintiff | Date of Termination | Date of EEOC Charge |
|-----------|--------------------|--------------------|
| Nely Davila | April 28, 1999 | April 4, 2000 |
| Margarita Erazo | April 16, 1999 | April 10, 2000 |
| Eva Escobedo | Nov. 11, 1999 | March 17, 2000 |
| Ernesto Garcia | May 30, 1999 | March 17, 2000 |
| Willie Mae Hopkins | Nov. 6, 1998 | Nov. 3, 1999[4] |
| Elizabeth Jaramillo | April 19, 1999[5] | April 4, 2000 |
| Ana Patricia Montes | Aug. 2, 1999 | March 20, 2000 |

---

[3] The record citations identifying the relevant dates for each plaintiff are as follows: Ms. Davila, Appellants' App. at 68, 71-72; Ms. Erazo, *id.* at 132, 136; Ms. Escobedo, *id.* at 174, 465; Mr. Garcia, *id.* at 196, 206; Ms. Hopkins, *id.* at 238; Ms. Jaramillo, *id.* at 247-48, 274; Ms. Montes, *id.* at 308, 312; Mr. Vargas, *id.* at 353, 357. Unless otherwise indicated, all record citations to the appendix are to the appellants' appendix ("App.").

[4] The district court concluded that Ms. Hopkins's charge was filed on March 3, 1999, because the defendants' summary judgment brief identified March 3, 1999, as the filing date against its interest. The actual filing date as identified on the charge itself is November 3, 1999. Because plaintiffs did not include any of the summary judgment papers in the appellate record and did not advocate our acceptance of the filing date deemed by the district court on appeal, we conclude that Ms. Hopkins's charge was filed on November 3, 1999, as indicated by the "received" stamp on the charge.

[5] Ms. Jaramillo was transferred to a different department on this date, not terminated. However, for our purposes, that fact is inconsequential because she stated that she was not subject to any harassment after the transfer. App. at 247-48, 271.

| Mervyn Vargas | May 11, 1999 | March 20, 2000 |

As the chart reflects, all but Ms. Escobedo, Mr. Garcia and Ms. Montes, filed charges with the EEOC more than three hundred days after their termination – a delay that would seemingly prove fatal to their effort to challenge the Clinic's conduct in court.

B

Plaintiffs suggest that this case is more complicated because they "filed charges" within the meaning of Title VII even before the dates reflected above. In support of this contention, plaintiffs submit that, long before they presented formal charges to the EEOC, they contacted the Colorado Civil Rights Division ("CCRD") – first by letter from their counsel on August 17, 1999, and then, shortly thereafter, by completing "intake forms" with the division.  These contacts with the CCRD, they contend, suffice to qualify as the "filing" of "charges" with the EEOC under Title VII.  Defendants, meanwhile, emphasize that no evidence reflecting or regarding these contacts with the CCRD exists in the record before us and urge that this deficiency is dispositive.  We must agree.  The viability of plaintiffs' argument can be assessed only with a review of the content of their submissions to the CCRD; without counsel's letter or the intake forms (all materials that are uniquely within plaintiffs' control), we are unable to do more than speculate whether they qualified as "charges" or whether they were "filed" within the time period prescribed by law.  And speculate we may not do.  *See*

*Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("To defeat a

motion for summary judgment, evidence, including testimony, must be based on

more than mere speculation, conjecture, or surmise.").

Indeed, to ascertain whether plaintiffs' materials might or might not qualify

as "filed charges" with the EEOC is not the straightforward task it might at first

blush seem. The question what sort of documents suffice to qualify as "charges"

under Title VII is surprisingly unresolved, *see, e.g.*, *Ledbetter*, 127 S. Ct. at 2166

n.1; *Edelman v. Lynchburg College*, 535 U.S. 106, 118-19 (2002), and has

generated a circuit split.[6] Some courts suggest that an informal intake

questionnaire filed with a state entity like the CCRD[7] or the EEOC almost always

constitutes an EEOC charge; others hold that it will rarely do so; these competing

---

[6] This debate is not confined to the Title VII context but extends to the
Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA")
context as well. Neither is the commonality of this problem a surprise given that
"the filing provisions of the ADEA and Title VII are virtually *in haec verba*, the
former having been patterned after the latter." *E.E.O.C. v. Commercial Office
Prods. Co.*, 486 U.S. 107, 123-124 (1988) (quotation omitted); *compare* 29 U.S.C.
§ 626(d), *with* 42 U.S.C. § 2000e-5(e)(1). For this reason, we occasionally cite
and find instructive the cases construing the ADEA's filing requirements together
with those construing Title VII's filing regime.

[7] Reflecting Congress's wish that claims be resolved locally and
voluntarily when possible, state agencies that satisfy statutory and regulatory
criteria ordinarily must be afforded the opportunity to first process claims of
discrimination. *See* 42 U.S.C. § 2000e-5(c); *see also* 29 C.F.R. § 1601.70; *id.*
§ 1601.80 (identifying the CCRD as such a state agency). Title VII's charge
filing provision accommodates this deferral requirement by extending the time
period required to file a charge with the EEOC from 180 to 300 days where the
aggrieved person initially instituted proceedings with such a state agency. *See* 42
U.S.C. § 2000e-5(e)(1).

positions are anchored by the Ninth and Sixth Circuits, respectively.[8]  Many

circuits appear to populate some form of middle ground; while these circuits

agree that a completed questionnaire must meet the EEOC's regulations

prescribing the minimum contents of a charge, *see* 29 C.F.R. § 1601.12 (minimum

contents of a Title VII charge); *id.* § 1626.8 (minimum contents of an ADEA

charge), they differ on what more is required.  Most apply some variant of the

"manifestation of intent" test – asking whether a reasonable person would have

known that the aggrieved person "intended to activate the Act's machinery"

through his or her submission of a questionnaire – but some consider additional

factors.[9]  To date, at least, our circuit has not been called to voice a view.

---

[8] *Compare Casavantes v. Cal. State Univ., Sacramento*, 732 F.2d 1441, 1443 (9th Cir. 1984) (concluding that under Title VII an intake questionnaire constituted a charge because it met the EEOC regulations governing the substantive content of a charge); *with Dorn v. Gen. Motors*, 131 Fed. Appx. 462, 470 n.7 (6th Cir. 2005) (unpub.) (ruling that the ADEA requires "a formal charge, not an inquiry or complaint").

[9] *Compare Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 568-69 (2d Cir. 2006) (holding an intake questionnaire to constitute a charge under the ADEA upon application of the "manifestation of intent" test although the EEOC did not consider the questionnaire to be a charge and the aggrieved person subsequently filed a formal charge); *with Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1240-41 (11th Cir. 2004) (applying the "manifestation of intent" test in the ADEA context and also considering the EEOC's perception of the document, the subjective intent of the aggrieved person, and the content of the questionnaire form); *Diez v. Minn. Mining & Mfg. Co.*, 88 F.3d 672, 676-77 (8th Cir. 1996) (same); *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 542-44 (7th Cir. 1988) (same).  *But see Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404-05 (4th Cir. 2004) (not applying the "manifestation of intent" test and holding a letter to be a charge under Title VII because it met the EEOC's charge-content regulations and the aggrieved party

(continued...)

Plaintiffs' argument would, of course, change all that and require us to decide whether and when the completion of an informal intake form with the CCRD may qualify as a "charge" with the EEOC. But without the plaintiffs' actual CCRD filings, or even some meaningful record evidence about their contents, we would be marching into an intercircuit split unable to contribute thoughtfully to the discussion or even fairly resolve this appeal, for we could not begin to say whether plaintiffs' filings meet even the minimum required to be considered a "charge" under *any* of the tests advanced by the circuit courts. Taking the most permissive standard applied by courts for determining whether submission of a questionnaire with a state entity constitutes a "charge" under Title VII, a plaintiff's state filing must satisfy the charge "content" regulations promulgated by the EEOC. *See*, *e.g.*, *Casavantes*, 732 F.2d at 1443. The applicable EEOC regulations, in turn, require "a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." *See* 29 C.F.R. § 1601.12(b). Although this standard is not

[9](...continued)
subjectively believed it to be a charge, although the EEOC did not).

To be sure, the Court recently granted certiorari to resolve a circuit split regarding whether and under what circumstances an "intake questionnaire" can qualify as a charge under the ADEA. *See Fed. Express Corp. v. Holowecki*, 127 S. Ct. 2914 (2007). Although the statutory regime is different, the Court's resolution of that question promises to offer at least some help in the Title VII context as well, given the parallel filing requirements. *See Commercial Office Prods.*, 486 U.S. at 123-124. For now, however, legally speaking we are where we are.

demanding, we simply cannot know whether it is satisfied in this case without an examination of plaintiffs' submission to the CCRD. Thus, for example, Title VII requires each discrete act of discrimination (such as termination, failure to promote, denial of transfer, or refusal to hire) to be described in and the subject of a timely filed charge. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *see also Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1184 (10th Cir. 2003) ("a claimant must file a charge of discrimination within the appropriate limitations period as to each such discrete act of discrimination that occurred"). That is, a plaintiff can bring a lawsuit for only those "unlawful employment practices" described in his or her administrative charge. Because we have no idea what acts of discrimination the plaintiffs in question included within their CCRD submission, we are in no position to assess what claims they may have preserved for litigation.

We find ourselves in an equally problematic position with respect to the question whether the alleged submission to the CCRD was ever "filed" with the EEOC in the requisite 300 day period. *See* 42 U.S.C. § 2000e-5(e)(1); *see also Ledbetter*, 127 S. Ct. at 2177. Even assuming that plaintiffs' unproduced state submissions qualify as "charges," we do not know when they were "filed" with the EEOC. If plaintiffs asked the CCRD to forward their "charges" to the EEOC, a filing would have been effected under EEOC regulations at most 60 days later, on October 16, 1999. *See* 29 C.F.R. § 1601.13(b)(1). However, if plaintiffs did

- 10 -

not so request, the CCRD documents would not have been filed with the EEOC unless (i) plaintiffs filed them with the EEOC themselves, or (ii) plaintiffs alleged and provided evidence of the existence of a worksharing agreement whereby the CCRD acted as the agent of the EEOC for purposes of accepting a charge even in the absence of a forwarding request. *See, e.g., Johnson v. J.B. Hunt Transp., Inc.*, 280 F.3d 1125, 1129-30 (7th Cir. 2002) (holding that, in light of a worksharing agreement between the state agency and the EEOC, a charge of discrimination filed with the state agency was "properly filed with the EEOC" on the same date). Because the record before us does not include plaintiffs' CCRD submission, and because there is no other evidence in the record suggesting that either a forwarding request was made or that a worksharing agreement existed, we simply cannot know whether plaintiffs "filed" within the requisite statutory time period.

C

Recognizing the limits of the record before us, plaintiffs offer two fallback arguments.

First, they assert that the EEOC's "relation-back" doctrine dissipates any cause for concern about the timeliness of their charges. *See* Reply Br. 6-7. Pursuant to that doctrine, a defective charge filed during the applicable 300-day period may be amended outside the limitations period to cure technical defects or omissions if the amendments are directly "related to or growing out of the subject matter of the original charge." 29 C.F.R. § 1601.12(b); *see also Edelman*, 535

U.S. at 118.[10]  But the relation-back principle applies, and a prior defective charge may be subsequently amended, only when the earlier filing can itself be fairly construed to operate as a "charge."  *See Peterson v. City of Wichita*, 888 F.2d 1307, 1308-09 (10th Cir. 1989) (permitting relation back where plaintiff submitted to the EEOC a timely though unverified charge); *see also Edelman v. Lynchburg Coll.*, 300 F.3d 400, 403-04 (4th Cir. 2002); *Pijnenburg v. W. Ga. Health Sys., Inc.*, 255 F.3d 1304, 1306-07 (11th Cir. 2001).  Plaintiffs' argument thus underscores rather than resolves our quandary, turning as it necessarily does on an assumption that their initial letter and intake forms to the CCRD qualified as "charges" to the EEOC, a question we simply are unable to answer on the record before us.

Second, plaintiffs respond that it was the Clinic, not them, who bore the burden of producing the CCRD correspondence and intake forms because whether plaintiffs "filed" a "charge" within the 300-day filing deadline is properly understood only as an affirmative defense and thus a matter on which the Clinic bore the burden of proof.  This, however, is an argument our precedents foreclose.  While Title VII's mandatory time limit for filing charges with the EEOC is not a jurisdictional prerequisite (and is thus subject to waiver, estoppel, and tolling

---

[10]  The Clinic argues in passing that plaintiffs may not rely on *Edelman*'s relation-back doctrine because it applies only to the "*lay* complainant," not plaintiffs represented by counsel.  Appellee's Br. 23.  Because application of the doctrine would not counsel for a different result, we assume (without deciding) that the doctrine applies in this case.

when equity requires), *see Zipes*, 455 U.S. at 393, the obligation to demonstrate timeliness in filing a charge is a condition precedent to suit and thus a burden for plaintiffs to carry, *see Million v. Frank*, 47 F.3d 385, 389 (10th Cir. 1995).[11]  The Supreme Court has repeatedly described compliance with Section 2000e-5(e)(1)'s filing requirements as "prerequisites that a plaintiff must satisfy before filing suit," *Morgan*, 536 U.S. at 109, noting as well that "[t]imely filing is a prerequisite to the maintenance of a Title VII action," *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 555 n.4 (1977).  In consonance with these directives, we and every circuit court to address the question directly therefore have deemed compliance with Title VII's filing deadline as a condition precedent rather than an affirmative defense.  *See Million*, 47 F.3d at 389 ("[t]he filing requirements of Title VII" are "condition[s] precedent"); *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 407 (6th Cir. 1999); *Lawrence v. Cooper Cmtys., Inc.*, 132 F.3d 447, 451 (8th Cir. 1998); *Perkins v. Silverstein*, 939 F.2d 463, 469-70 (7th Cir. 1991); *Jackson v. Seaboard Coast Line R.R.*, 678 F.2d 992, 1010-11 (11th Cir. 1982).[12]

---

[11]  *See also* Moore's Federal Practice § 9.04[5] (3d ed. 2006) ("Pleading conditions precedent is not a requirement of subject matter jurisdiction, and therefore the defense [of nonperformance or nonoccurrence of a condition precedent] may be waived.").

[12]  On first blush, the D.C. Circuit appears to abide by the contrary rule. *See Smith-Haynie v. District of Columbia*, 155 F.3d 575, 577 (D.C. Cir. 1998) ("In *Gordon v. National Youth Work Alliance*, 675 F.2d 356, 360 (D.C. Cir.

(continued...)

- 13 -

The structure of the Act supports this conclusion. The filing deadlines associated with a Title VII charge are integrated into the statutory section that delineates the various other steps a prospective plaintiff must satisfy before being given the keys to the courthouse door to file a complaint. *See generally* 42 U.S.C. § 2000e-5(f)(1) (requiring notification of the Commission's dismissal of, or failure to act upon, a charge filed pursuant to the statutory scheme prior to bringing a civil action); *see also Ledbetter*, 127 S. Ct. at 2166-67. This is in contrast to traditional affirmative defenses which are separate bars to suit and often not so integrated into the plaintiffs' cause of action. *Cf. Jones v. Bock*, __ U.S. __, 127 S. Ct. 910, 919 (2007) (in holding that the exhaustion requirement contained in the Prison Litigation Reform Act, 42 U.S.C. § 1997e *et seq*. ("PLRA"), was an affirmative defense to action brought under 42 U.S.C. § 1983, the court found significant that the "PLRA itself is not a source of a prisoner's claim [rather, Section 1983 was and it does not require exhaustion]"). Placing the burden upon plaintiffs makes sense, too, of the practical realities at hand, for they enjoy superior access to the evidence necessary to prove their compliance with

[12](...continued) 1982), we said that a statute of limitations defense under Title VII is an affirmative defense . . . ."). However, *Gordon* did not hold that the Title VII limitations period *is* an affirmative defense; rather, it referred to the filing period as something "like a statute of limitations" which "generally create affirmative defenses." *See Gordon*, 675 F.2d at 360. Furthermore, *Gordon*'s discussion came in response to the defendant's (rejected) claim that the filing period was jurisdictional and did not purport to address, let alone decide, whether compliance with the filing deadline was a condition precedent or an affirmative defense.

the statutory filing deadline, here their own letter and completed state forms. *See* Wright & Graham, Federal Practice and Procedure: Evidence 2d § 5122 at 403 (2005); *accord United States v. Cont. Ins. Co.*, 776 F.2d 962, 964 (11th Cir. 1985); *Old Ben Coal Corp. v. Interior Bd. of Mine Op. App.*, 523 F.2d 25, 36 (7th Cir. 1975).[13]

## II

Unaffected by our analysis and disposition so far are the timely claims of Ms. Escobedo, Mr. Garcia, and Ms. Montes. With respect to each, and by turn, we outline the relevant timely factual allegations and pertinent legal analysis.

## A

Ms. Escobedo, a Hispanic woman of Mexican descent, worked as a housekeeper in the Clinic's operating room department from approximately December 1997 through November 1999. *See* App. at 140, 142-43, 465. Ms. Escobedo's claims revolve primarily around two facts: an instruction she received to speak only English in the Clinic's operating rooms, and additional work she received from her supervisor that prompted her to quit. Combined, she

---

[13] Plaintiffs have not argued waiver, estoppel, or that the doctrine of equitable tolling should apply to cure their tardy filings, and based on the facts before us, we see nothing demanding their application. *See, e.g., Biester v. Midwest Health Servs., Inc.*, 77 F.3d 1264, 1267 (10th Cir. 1996) (recognizing equitable tolling in the Title VII context where the plaintiff has been deceived, "lulled into inaction," "actively misled," or "has in some extraordinary way been prevented from asserting his or her rights" (quotations and citations omitted)).

contends, these circumstances suffice to give rise to Title VII claims for hostile work environment and disparate treatment.

1

Because she had difficulty speaking English, *see* App. at 140, when she began working at the Clinic Ms. Escobedo primarily communicated with the English speaking operating room nurses through the aid of an interpreter. *See* App. at 146; *see also id.* at 159. Once, albeit in what she describes as a "nice way," an operating room nurse asked Ms. Escobedo to speak in English; the nurse explained that she would like Ms. Escobedo to practice her English because being more proficient would aid her job performance. *See id.* at 159. Ms. Escobedo testified that she did indeed have difficulty receiving lengthy instruction from the nurses and that her job duties required "quickly" and carefully cleaning the operating rooms in compliance with directions from the operating room nurses. *See id.*; *see also id.* at 80-81.

A few months later, Onesima Mejia, the housekeeping department supervisor, acting upon the request of the same operating room nurse, reiterated the nurse's instruction that Ms. Escobedo and the other operating room housekeeper speak English rather than Spanish while working in the operating rooms. *Id.* at 159, 176. However, Ms. Escobedo was expressly permitted to speak Spanish during her breaks. *Id.* at 176. Neither does Ms. Escobedo allege that she, or any other housekeeper, was asked to speak English outside of the

- 16 -

operating room department or forbidden from engaging in non-job related conversations with other Spanish speakers in her native tongue.[14] Ms. Escobedo also testified that she never complained about the nurses' instruction, *see id.* at 159, although she reported other grievances, including the increased work assignments she received from Ms. Mejia, *see, e.g., id.* at 157.

Ms. Escobedo complains that, from shortly after she joined the Clinic to the day of her resignation, her duties were repeatedly enlarged to include chores the nurses had previously been responsible for, such as stocking medical supplies in the operating rooms and moving stretchers from one room to another. *See id.* at 143-44. The nurses explained that other hospital staff "had too much work" and that the housekeepers essentially had to fill the gap. *Id.* at 144. Ms. Escobedo resigned because of this additional work – it eventually became "too much." *Id.* at 144. However, she does not allege that the nurses assigned her work out of any ill will. To the contrary, she repeatedly testified that she got along well with the nurses; their positive feedback to Douglas Grinnell, the housekeeping department manager, and Ms. Mejia was the reason she received raises; and on at least one occasion they tried to intervene on her behalf with Ms. Mejia. *See, e.g., id.* at 149, 157. Neither does Ms. Escobedo allege that she was singled out for

---

[14] Rather, each housekeeper who was told to speak English was instructed to do so only while working in the operating room department and was advised that the policy did not apply during breaks. *See* App. 109, 135, 159, 176, 259.

additional work; rather, she testified that she never believed she was assigned any more work than anyone else. *See id.* at 158.

Ms. Escobedo informed Ms. Mejia and Mr. Grinnell of the difficult workload and requested they hire an additional housekeeper, something which they declined to do. *See id.* at 148. Stan Anderson, Mr. Grinnell's superior and the Clinic's Director of Facilities, testified that Mr. Grinnell was tasked with "[b]udgetary control" of the housekeeping department and that the "marching orders" were to "maintain" the existing budget. *Id.* at 2, 6. The message sent from Mr. Anderson was that the staffing was already "very, very generous" and not to enlarge the staff, though Mr. Grinnell was not expressly forbidden from doing so. *Id.*

2

Ms. Escobedo claims that the foregoing facts – the English-only instruction plus the additional work assignments she received – give rise in the first instance to a claim for hostile work environment. In determining whether an actionable hostile work environment existed, "we look to all the circumstances," *Morgan*, 536 U.S. at 116 (quotation omitted), to see if the workplace was "permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment," and if the plaintiff was subjected to this abusive environment because of her national origin.

- 18 -

*Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007) (quotation omitted).

In this undertaking, we consider all the circumstances not from the plaintiff's subjective point of view but from the perspective of a reasonable person in the plaintiff's position. *Id.* Still, the victim must also "subjectively perceive the environment to be abusive" because without such a belief, "the conduct has not actually *altered* the conditions of the victim's employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) (emphasis added); *see also id.* at 25 (Ginsburg, J., concurring) ("It suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to make it more difficult to do the job." (quotation and alteration omitted)). The question on summary judgment, then, is whether a jury, in view of all of the evidence, could reasonably conclude the discriminatory harassment to be sufficiently severe or pervasive as "to alter the conditions of [the victim's] employment and create an abusive working environment," *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986) (quotation omitted), and that the victim subjectively perceived the environment to be abusive, *Harris*, 510 U.S. at 21-22.

a

We begin by recognizing that English-only instructions indeed can, in certain circumstances, "create[] a hostile atmosphere for Hispanics in their

workplace" and thus violate Title VII. *Maldonado v. City of Altus*, 433 F.3d

1294, 1304 (10th Cir. 2006), *abrogated in part on other grounds*, *Burlington N. &*

*Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2414-15 (2006); *see also Garcia v.*

*Gloor*, 618 F.2d 264, 268 (5th Cir. 1980) (noting that while "[n]either the statute

nor common understanding equates national origin with the language that one

chooses to speak[, l]anguage may be used as a covert basis for national origin

discrimination"); 29 C.F.R. § 1606.7(a) (observing that English-only policies may

foster a sense of "inferiority, isolation and intimidation based on [an employee's]

national origin").[15]

To date, however, we have addressed only a sweeping English-only policy

mechanically enforced by an employer in all circumstances and at all times within

the work environment; we have not had occasion to review a more tailored policy

limited, like the one now before us, to specific places or times within the

workplace. *See Maldonado*, 433 F.3d at 1307-08 (holding that an English-only

---

[15] Courts have primarily addressed the effect of an English-only policy under a disparate impact theory. *See, e.g., Maldonado*, 433 F.3d at 1303-07; *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1485 (9th Cir. 1993); *Gloor*, 618 F.2d at 270; *E.E.O.C. v. Synchro-Start Prods., Inc.*, 29 F. Supp. 2d 911, 912 (N.D. Ill. 1999). In those cases, the courts were called to decide issues not raised before us – specifically, whether an English-only policy effected a disparate impact on Hispanic workers. Conversely, of course, a disparate impact theory does not require proof of discriminatory animus like the hostile work environment theory under which Ms. Escobedo chose to proceed in this case. Because our analysis is confined to a hostile work environment claim in which animus is required, we offer no views regarding what might have been the appropriate outcome of this case under a disparate impact theory.

policy, which applied at all times to all employees regardless of occupation or activity, may have created a hostile work environment).

For its part, however, the EEOC, expressly distinguishes between English-only policies on just this basis. *See* 29 C.F.R. § 1606.7. With respect to policies blithely enforced at all times and places in the work environment, the EEOC presumes, subject to rebuttal, that they violate Title VII. *See id.* § 1606.7(a). With respect to tailored policies applicable only at "certain times" or places, the EEOC endorses no such presumption, suggesting that such rules may more often be linked to legitimate "business necessit[ies]." *Id.* § 1606.7(b).

While the EEOC's guidelines are not controlling, *Maldonado*, 433 F.3d at 1305, we have intimated that they are nonetheless "entitled to respect, not as interpretations of the governing law, but as an indication of what a reasonable, informed person may think about the impact of an English-only work rule on minority employees, even if we might not draw the same inference." *Id.* at 1306. It is with this standard in mind that we turn to a consideration of the policy before us.

The English-only rule complained of here prohibited Ms. Escobedo and other housekeepers from speaking Spanish solely while working in the operating room department, and apparently only for job-related discussions, and carried with it a conceded business necessity. The policy bore no apparent effect in any other place within the Clinic or during Ms. Escobedo's breaks or to discussions

unrelated to her job, and thus, according to the EEOC, is a policy applicable only at "certain times" or places justifiable on a showing of business necessity. *See, e.g., E.E.O.C. Decision No. 83-7*, 31 Fair Empl. Prac. Cas. (BNA) 1861, 1983 WL 22488, at *2 (E.E.O.C. Apr. 20, 1983). Likewise, it is undisputed that clear and precise communication between the cleaning staff and the medical staff was essential in the operating rooms; that the sanitariness of the operating rooms was of paramount importance to the hospital (not to mention the health and safety of its patients); and that most of the operating room nurses did not speak Spanish and thus could not communicate with Ms. Escobedo without resort to an English-only policy. *See* Appellee's Br. 39; App. at 228. Ms. Escobedo herself admits that maintaining the sanitariness of the operating rooms necessitated the "quick" and careful performance of her duties and that communication with the nurses was essential. Neither do we have any evidence before us that the Clinic's policy was the product of, or resulted in, any sort of discriminatory animus.[16]

All of this taken together – the narrowness of the Clinic's policy, its origin in the Clinic's undisputed business necessity, and the absence of any evidence suggesting that the policy was the product of improper motive or that it gave rise

---

[16] To be sure, one might question the asserted "business necessity" of an English-only policy if the employer knowingly hires employees who lack English skills. The record before us, however, indicates that the Clinic became aware of communication problems in the operating room only after Ms. Escobedo was hired and, in fact, subsequently instituted a requirement that any housekeeper seeking placement in the operating room department first demonstrate English proficiency. *See* App. at 135.

to any discriminatory effect – distinguish this case from the policy we faced in *Maldonado* and the sorts of cases the EEOC has found to violate Title VII. *See Maldonado*, 433 F.3d at 1304-06 (observing that the business necessity proffered by the defendant was "scant" and that the blanket policy gave rise to ethnic taunting); *see also, e.g., Christina Childress v. U.S. Air Force*, EEOC DOC 01842814, 1986 WL 635306, at *4-5 (E.E.O.C. July 7, 1986). On the record before us, and in consonance with the EEOC's views, we therefore cannot see any reasonable basis for concluding the Clinic's policy sufficient to give rise to a hostile work environment claim.

b

With respect to her claims of additional work assignments, Ms. Escobedo makes no allegation that she or any other employee was singled out on the basis of race or national origin. In fact, she testified that she believed her work assignments were excessive because there was a shortage of housekeeping staff.

Of course, even when an increase in assignments is not on its face discriminatory, if there exists other evidence of discriminatory conduct, a jury may reasonably infer that even seemingly non-discriminatory work assignments were in fact motivated by discriminatory animus. *See Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005). But in order for facially non-discriminatory conduct to be so tainted, the "other" conduct at issue must be "'overtly'" discriminatory. *Id.* (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093,

1097 (10th Cir. 1999)).  Here, however, the only conduct by the nurses which even tangentially relates to Ms. Escobedo's national origin is the English-only instruction related to the operating rooms.  But, as we have noted, Ms. Escobedo has not alleged that it was a vehicle to effect any discriminatory animus harbored by the nurses, let alone provide evidence of such intent or effect; to the contrary, Ms. Escobedo testified that she got along well with the nurses and they supported her in disputes with her supervisors.  This evidence before us thus simply does not permit an inference of "overt" discrimination as required by our precedent and we cannot say that the combination of the two incidents could reasonably be found to have created a hostile atmosphere.  *See Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (holding that plaintiff failed to present a triable issue as to a hostile work environment where the "derisive environment in the workshop was universal" – he was not "singled out" for abuse – and he failed to show the derisive atmosphere "stemmed from racial animus"); *cf. O'Shea*, 185 F.3d at 1098, 1102 (holding that the "obviously sex and gender-motivated conduct" by a supervisor – including, *inter alia*, his stated belief "that women in general were incompetent, stupid and scatterbrained" – "so poisoned the entire body of conduct toward Plaintiff that a jury reasonably could view *all* of the allegedly harassing conduct . . . as the product of sex and gender hostility").[17]

---

[17] Ms. Escobedo might still be afforded redress under a hostile work environment theory if untimely incidents, in conjunction with timely incidents,

(continued...)

Beyond her hostile work environment claim, Ms. Escobedo also seeks relief under a disparate treatment theory, relying here solely on her allegations of excessive work. To succeed in a disparate treatment claim, Ms. Escobedo must show that, through her work assignments, the Clinic intentionally discriminated against her. *See Ledbetter*, 127 S. Ct. at 2167. Because Ms. Escobedo seeks to prove such animus solely through indirect or circumstantial evidence, we examine her claim through the prism of the familiar burden-shifting framework established by *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-04 (1973). Pursuant to *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination. *See Young*, 468 F.3d at 1249. Once he or she does so, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant satisfies its burden, the

---

[17](...continued)
created a hostile work environment. *See Duncan v. Manager, Dep't of Safety*, 397 F.3d 1300, 1309 (10th Cir. 2005). To do so, however, Ms. Escobedo would have to demonstrate that the untimely incidents were so related by type, frequency, and perpetrator to the English-only instruction or increased work assignments that they fairly could be construed to be part of the same unlawful employment practice. *See Morgan*, 536 U.S. at 116-17, 120. This Ms. Escobedo has not even attempted to do, and so we deem any argument along these lines waived. *See Murrell v. Shalala*, 43 F.3d 1388, 1390 (10th Cir. 1994). Even if we were able to overcome this hurdle, after independently reviewing the untimely incidents identified by Ms. Escobedo, we see no common thread between them and the timely incidents alleged by Ms. Escobedo sufficient to permit their use here.

plaintiff must then show that the defendant's proffered justification was simply pretext for unlawful discrimination. *Id.*

For our purposes, even should we assume that the additional duties Ms. Escobedo received qualify as a materially adverse employment action for purposes of *McDonnell Douglas*'s first step, her claim would still falter. There is no question in this case but that the Clinic has "articulate[d] some legitimate, non-discriminatory reason for the adverse employment action." *Young*, 468 F.3d at 1249. Ms. Escobedo herself testified that the nurses assigned additional work to her and other housekeepers because there was a shortage of staff, and that she was assigned no more work than any other housekeeper. There is record evidence, as well, that the housekeeping department was discouraged from enlarging its staff because of budgetary constraints. In light of these facts, we must acknowledge that the Clinic has met its "exceedingly light" burden of establishing a legitimate, non-discriminatory reason for its challenged actions under *McDonnell Douglas*'s second step, *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1165 (10th Cir. 2007) (en banc), by producing evidence that Ms. Escobedo's cleaning duties were increased in parity with other housekeepers and because of the surplus of work in the department; the lack of additional staff to complete it; and the need to keep costs down.

To reach trial, Ms. Escobedo must therefore show that there is a genuine issue of material fact regarding whether the Clinic's justification was pretextual.

*Young*, 468 F.3d at 1249. To accomplish this, Ms. Escobedo must present facts suggesting that the Clinic's "proffered [national origin neutral] reasons were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Id.* at 1250.[18] This Ms. Escobedo fails to do. Ms. Escobedo herself repeatedly testified to the excess work throughout the entire housekeeping department and its even-handed distribution. She does not allege that the Clinic had an excess of funds or in any way contest its assertions of economy. Neither does she contend that she received her new assignments because she was Hispanic. Rather, her own testimony establishes that she had at least a cordial relationship with the nursing staff and that they repeatedly commended the quality of her work to Mr. Grinnell and Ms. Mejia, which resulted in her receipt of a raise. Based on these facts, we are without choice but to affirm the district court's grant of summary judgment to the Clinic as to Ms. Escobedo's claims.[19]

---

[18] But showing that the employer's proffered non-discriminatory reasons are false will not "'*always* be adequate to sustain . . . liability.'" *Young*, 468 F.3d at 1250 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)). Rather, "the factfinder must be able to conclude, based on a preponderance of the evidence, that *discrimination was a determinative factor* in the employer's actions – simply disbelieving the employer is insufficient." *Id.* (quotation omitted).

[19] Ms. Escobedo also seeks relief under a constructive discharge theory. Supporting her claim, she asserts that the hostile work environment she endured was so abusive that it left her no choice but to resign. The Supreme Court has instructed that "[a] plaintiff who advances such a compound claim [– a

(continued...)

B

Mr. Garcia, a Hispanic man, worked in the Clinic's housekeeping department from 1995 until 1999. *See* App. 190, 206. Mr. Garcia claims that the confluence of being assigned an excessive amount of work and the Clinic's policy of forbidding family members from visiting employees during work hours at the hospital gives rise to a hostile work environment claim.

1

Much like Ms. Escobedo, Mr. Garcia claims that he was forced to resign because Ms. Mejia assigned him "a whole lot of [additional] work, and [he] couldn't do that sort of work." *Id.* at 184-85, 195. He contends that he quit before attempting to take on Ms. Mejia's new work assignments because "[he] was barely able to finish with the assignments that [he] had before." *Id.* at 196-97. Prior to the enlargement of his job responsibilities, Mr. Garcia's duties included cleaning offices, and part of a hallway, as well as disposing of the garbage in the infectious diseases wing of the hospital. *See id.* at 185. The

---

[19](...continued)
constructive discharge claim premised on a hostile work environment –] must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004); *see also E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 805-06 (10th Cir. 2007) (same). As presented to us, however, this claim is inexorably linked to her hostile work environment claim; for the same reasons that claim has fallen, so too must this one.

- 28 -

additional work Ms. Mejia sought to add included cleaning elevators, welcome mats, and sweeping and mopping stairways. *See id.*

Mr. Garcia presented various reasons for Ms. Mejia's perceived mistreatment of him. Initially, he testified that he did not know if discriminatory animus motivated Ms. Mejia's assignment of additional work, *see id.* at 185 ("Q. Do you think you were getting this extra work because you were Hispanic? A. Well, that I don't know."). Later, he added his opinion that he was given too much work because he was Hispanic, although he candidly admitted he had no facts to support this belief. *See id.* at 200. Elsewhere still, he stated that Ms. Mejia treated him more poorly when she was "mad" but he believed her anger was not "personal" to him and that he was not the cause of it; rather, her anger stemmed "from home" issues. *Id.* at 198. And, finally, Mr. Garcia expressed the belief that the Clinic assigned him excessive work in the hopes that he would resign so that it could hire a replacement at a lower wage. *See id.* at 208-09.

Mr. Garcia complains as well that Ms. Mejia and Mr. Grinnell repeatedly expressed in housekeeping department meetings the Clinic's policy forbidding the housekeeping staff's family members from waiting in the Clinic lobby, *see id.* at 194, 208, and he indicates that he was reprimanded sometime during January 1999 for failing to comply with this policy, *see id.* at 209 ("[I]n January 1999, Onesima saw my wife in the lobby and told me again that my wife could not wait there."). In response, Mr. Anderson testified for the Clinic that this policy

applied to all departments, and his assertion has not been contradicted on appeal. *See id.* at 9; *see also id.* at 184.

2

We are unable to discern from these limited facts a basis on which a reasonable jury might infer a hostile work environment in violation of Title VII. None of the traditional "hallmarks" of such a claim, such as evidence of ridicule or mistreatment based on race or national origin, are present. *Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998); *see also Herrera*, 474 F.3d at 681-82; *see also PVNF*, 487 F.3d at 798-99. To be sure, at one point Mr. Garcia expressed the view that he received additional work assignments because he is Hispanic. But Mr. Garcia then proceeded to walk away from that testimony, admitting that he had no factual basis for his opinion, and suggesting that Ms. Mejia's behavior was instead the product of personal "home" issues. At no point, moreover, has Mr. Garcia contested that the Clinic faced purely economic pressures that compelled its assignment of additional responsibilities to housekeeping staff.

Similarly, a jury could not reasonably divine that Ms. Mejia's decision to discipline him for failing to comply with the Clinic policy forbidding family members from entering the Clinic had anything to do with Mr. Garcia's national origin. Far from suggesting an inference that Ms. Mejia or the Clinic applied the policy only to Hispanics or solely reprimanded Hispanics or other minorities for

violating the rule, the record before us contains uncontroverted evidence that the policy was applied to all Clinic staff.[20]

## C

Ms. Montes, a Hispanic woman, was employed in the Clinic's housekeeping department from 1992 until she was fired in 1999, a firing she contends was the result of unlawful retaliation.

### 1

During her time at the Clinic, Ms. Montes met with a lawyer regarding the potential of bringing this lawsuit against the Clinic. *See* App. at 292. Ms. Montes asserts that one of her co-workers, Felipe Martinez, knew of her meeting with counsel and told Ms. Mejia. *See id.* at 291-92. Fired two months later by Mr. Grinnell, Ms. Montes claims her discharge was the product of retaliatory animus and designed to punish her decision to seek legal consultation. *See id.* at 293. Meanwhile, the Clinic asserts that Mr. Grinnell discharged Ms. Montes for insubordination after she failed to follow a supervisor's housekeeping directive. *See id.* at 291. Ms. Montes candidly admits that, shortly before being fired, she did disregard an order from the Clinic's lead housekeeper, Mercedes Agurcia, but

---

[20] Mr. Garcia claims that the abusive work environment led to his constructive discharge. But Mr. Garcia's constructive discharge claim, like Ms. Escobedo's, relies entirely on the merits of his hostile work environment claim and fails with it. *See supra* p. 27 n.19. Similarly, Mr. Garcia seeks relief under a disparate treatment theory alleging that the Clinic discriminated against him by assigning excessive work. But this claim presents the same legal question raised by Ms. Escobedo and it fails for the same reasons. *See supra* pp. 25-27.

urges that her insubordination was justified because the duty Ms. Agurcia sought to assign to her properly belonged to a different employee. *See id.*[21]

2

Title VII forbids retaliation against employees who voice opposition to, or participate in an investigation or proceeding alleging, an unlawful employment practice by his or her employer. *See* 42 U.S.C. § 2000e-3(a). Because Ms. Montes seeks to prove her retaliation claim solely through indirect or circumstantial evidence of discriminatory animus, we turn again to *McDonnell Douglas* in analyzing her claim. *See Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1229 (10th Cir. 2004).

In order to state a *prima facie* case for retaliation under *McDonnell Douglas*'s first step, Ms. Montes must demonstrate that (1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have found material; and (3) a causal nexus exists between her opposition and the employer's adverse action. *See PVNF*, 487 F.3d at 803; *see also White*, 126 S. Ct. at 2414-15. The only element in dispute here is the last – that is, whether Ms. Montes has established the required causal nexus

---

[21] Because Ms. Montes's only timely allegations relate to her retaliation claim, we include the facts relevant to that claim only; as the Court noted in *Morgan*, untimely discrete acts of discrimination may not be considered, and untimely acts constituting part of a hostile work environment claim may be considered only if the claim includes at least one timely act. *See Morgan*, 536 U.S. at 114, 118.

between her discharge and her consultation with counsel. To satisfy this element, a "plaintiff must show that the individual who took adverse action against [her] knew of the employee's protected activity," *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993), or that Ms. Mejia, the person allegedly harboring discriminatory animus, knew and used Mr. Grinnell, the person who effected the adverse action, "as a cat's paw to effect . . . her own biased designs." *Young*, 468 F.3d at 1253.

Ms. Montes runs into an insuperable obstacle in seeking to satisfy these standards, for her evidence that *any* superior at the Clinic was even aware of her meeting with counsel derives from a single hearsay statement. Ms. Montes asserts that Ms. Mejia became aware that she met with counsel regarding her claims of discrimination by way of a co-worker – Mr. Martinez. Ms. Montes, however, submits only her own second-hand, hearsay account of the encounter between Mr. Martinez and Ms. Mejia as relayed by Mr. Martinez; unfortunately, we have before us no testimony from Mr. Martinez himself. Under our precedents, we are constrained to disregard such hearsay on summary judgment when, as here, there is a proper objection to its use and the proponent of the testimony can direct us to no applicable exception to the hearsay rule. *See* Appellee's Br. 60-61; *Young*, 468 F.3d at 1252.

Even if Ms. Montes had presented a *prima facie* case of retaliation, however, her claim would nonetheless fail at a later stage in the *McDonnell Douglas* analysis because she has not rebutted the Clinic's non-discriminatory

reason for her termination.  *See Meiners*, 359 F.3d at 1229.  Indeed, Ms. Montes readily admitted that she was insubordinate, just as the Clinic claims.  Of course, Ms. Montes seeks to show that the Clinic's proffered reason for firing her was really "subterfuge for [retaliation]."  *Young*, 468 F.3d at 1250.  But the only reason she advances suggesting that her termination was tainted with retaliatory animus was Ms. Mejia's purported awareness of her meeting with counsel.  Even overlooking the hearsay issue and assuming such awareness, however, Ms. Montes presents no competent evidence from which a jury could infer that this information was ever relayed from Ms. Mejia to Mr. Grinnell, the supervisor who fired her; neither does she allege that Ms. Mejia influenced Mr. Grinnell's decision to terminate her in any way so as to make him her "cat's paw."  *Id.* at 1253.  Without some facts along one of these lines, one might conclude that she was retaliated against only by indulging in impermissible speculation.  *See Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1216 (10th Cir. 2004).

✳   ✳   ✳

We do not question that the Clinic may have been an unpleasant place to work for the plaintiffs, but there is insufficient evidence in the record before us from which a jury might reasonably conclude that the Clinic's conduct was the result of unlawful discrimination rather than hard-nosed business decisions necessitated in some instances by economic pressures.  Neither can we overlook

the absence of evidence in this record establishing the timeliness of many plaintiffs' claims.  For these reasons, the district court's judgment is

*Affirmed.*