FILED
United States Court of Appeals
Tenth Circuit

December 21, 2009

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

DAVA DALVIT;
DEBRA BENJAMIN,

      Plaintiffs-Appellants,

v.

UNITED AIRLINES, INC.,

      Defendant-Appellee.

No. 08-1283
(D.C. Nos. 1:07-CV-725-WDM-CBS
& 1:07-CV-726-WDM)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, **MURPHY**, and **HARTZ**, Circuit Judges.

---

      Plaintiffs Dava Dalvit and Debra Benjamin sued United Air Lines, Inc.

(UAL) asserting discrimination and retaliation claims under a variety of federal

and state statutes. The district court granted summary judgment in favor of UAL

on all of their claims. Plaintiffs now appeal the grant of summary judgment on

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is
therefore ordered submitted without oral argument. This order and judgment is
not binding precedent, except under the doctrines of law of the case, res judicata,
and collateral estoppel. It may be cited, however, for its persuasive value
consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

their discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17.  We affirm.

## BACKGROUND

### 1.  Organization of the FIT Team

Plaintiffs worked as ramp supervisors at UAL's facility at Denver International Airport (DIA).  Ramp supervisors were responsible for various tasks associated with ensuring the on-time departure of aircraft.  They reported to Operating Managers, who reported to Department Managers, who reported in turn to the Station Manager.

Ramp supervisors were responsible for working an eight-hour day and for certifying their hours worked using an automated "pay certification" process.[1] If they left early before completing an eight-hour day, they were required to inform an Operating Manager before leaving.  For hourly exceptions such as arriving late or leaving early, they were expected to handwrite the exceptions on their pay certifications.  There is some question about how strictly the pay certification process was enforced.  While UAL's policies do not permit

---

[1]     Some evidence in the record suggests that ramp supervisors were actually required to "cert" an eight-and-one-half hour day, with the half-hour being allocated to a lunch break.  Any such factual discrepancy is not material to the issues in this appeal, and we refer throughout this order and judgment to an eight-hour day.

supervisors to certify that they have worked an eight-hour day when they have not done so, plaintiffs assert that male supervisors did so at times without penalty.

In late 2005, UAL began assembling a temporary "FIT Team" at DIA. As initially constituted, the FIT Team included three women--both plaintiffs and one other female ramp supervisor--and three male ramp supervisors. The purpose of the FIT Team, whose initials stood for "fix, improve, transform," was to improve performance on the ramp.[2] Appointment to the FIT Team was not considered a promotion, but Kevin Mortimer, UAL's Department Manager of Ramp Services, did tell at least one member of the FIT Team that it would be advantageous to his career development to be part of the team.

The FIT Team met for the first time on November 28, 2005. At this meeting, Steve Nail, who was overseeing the team, set out his expectations concerning working hours for team members. He stated that there would not be any pre-determined start or finish times for their shifts, and that team members could work a flexible schedule, with some days shorter than eight hours, and some days longer, so long as they completed all their required tasks. Team members were, however, required to keep him informed as to what shifts they would be working.

---

[2]     The "FIT Team" is sometimes referred to in the record as the "ROP Team." "ROP" stands for "resource optimization." For the sake of consistency, we refer throughout this order and judgment to the "FIT Team."

Plaintiff Benjamin asked Nail, in light of their flexible hours, how FIT Team members were supposed to "cert" their time. He said he would get clarification for her on that issue, but he never did. Benjamin admits that while working as a member of the FIT Team, she turned in pay certifications showing that she had worked eight hours on some days when she had not. Pay certification was complicated by the fact that the certification schedules were no longer handwritten and she couldn't write in her actual time on the certifications as she had previously done. Instead, Benjamin kept a log of her actual hours on the computer. She did not provide this log to management.

Plaintiff Dalvit testified that while she was on the FIT Team, work start times were flexible and sometimes she left early. She did not tell anyone on occasions when she left early. As she understood it, communication about leaving early was not expected of Team members.

## 2. Initial Investigation of Plaintiffs' Time Certifications

In December 2005, shortly after the FIT Team was assembled, two Operating Managers, Steve Peters and Terry Schenck, expressed concern to Nail that plaintiffs may not have been working full, eight-hour shifts. Nail asked if the men had any evidence. They replied that they did not.

Around the same time, Nail assigned plaintiffs to attend a 5:00 a.m. briefing to explain the purpose of the FIT Team to other supervisory employees. When Nail later asked Peters how the briefing had gone, Peters had no idea what

he was talking about. He told Nail that plaintiffs had not attended the briefing and had not discussed the FIT Team as ordered.

Nail took his concerns about plaintiffs' attendance to his immediate supervisor, Mortimer, and asked him for guidance on how to deal with the situation. Mortimer told Nail to check plaintiffs' "badge histories" to see what they showed about their attendance. Nail obtained from the City and County of Denver records showing plaintiffs' entry and exits from the secure areas of DIA and their entries and exits from the employee parking lots at DIA (referred to in the record as plaintiffs' "rings"). He then prepared spreadsheets using these records summarizing plaintiffs' access card use for December 2005. The records and spreadsheets revealed that plaintiffs had failed to work an eight-hour day on some of the days they had certified that they had worked eight hours.

Armed with these records and spreadsheets, Mortimer approached James Kyte, UAL's Station Manager at DIA, and asked him for advice. Kyte determined that an investigation was warranted. He selected Jean Massey, Department Manager of Facilities and Ground Equipment Maintenance, a department completely separate from Ramp Services, to conduct the investigation. He felt that Massey would bring an unbiased perspective to the situation.

### 3. Massey's Investigation

Massey examined the plaintiffs' DIA rings and the spreadsheets Nail had prepared. On December 28, 2005, Massey and Nail met separately with each plaintiff to discuss the investigation. Massey advised plaintiffs that she was conducting an investigation into discrepancies between the hours recorded on their pay certifications and their arrival and departure records. She showed them their DIA rings. Plaintiff Dalvit responded that they were part of a special assignment team and had flexible hours. Massey replied that she was not concerned about the days when plaintiffs worked late, only the days when they went home early but turned in certifications showing that they had worked a full day.

Massey then confiscated plaintiffs' access badges and sent them home. The decision to send plaintiffs home was Massey's. Massey later told plaintiffs they could submit information to her to be considered as part of the investigation.

The investigation continued. Massey discussed the problem of hours for FIT Team members with Nail. He told her that he had told members of the Team that they would have flexible hours but that they were to work eight and a half hours each day. Massey spoke to other Team members. They told her that they understood from Nail's directives that they were allowed to work more or fewer hours in a day than an eight-hour shift. While Massey was conducting her

investigation, plaintiffs contacted other FIT Team members to obtain statements from them about the Team's flexible work schedules.

### 4. Plaintiffs' Complaint of Sex Discrimination

After they were suspended, plaintiffs contacted Gary Thomas, a human resources generalist at UAL's Chicago headquarters. They complained that their suspension was discriminatory. Jeanne Nelli of Human Resources (HR) volunteered to come to Denver to conduct an investigation. But plaintiffs never followed through by filing a formal complaint of discrimination with UAL; as a result, Nelli ceased her investigatory efforts.

### 5. Results of the Investigation

On January 18, 2006, Massey and Mortimer met with plaintiffs. During this meeting, Massey gave plaintiffs formal Letters of Counsel that summarized her findings. In the Letters of Counsel, she stated that there was insufficient evidence to conclude that either plaintiff had falsified company records. But she further stated that plaintiffs' conduct during their assignment to the FIT Team and during the investigation had caused Massey to question their leadership abilities at UAL. She had two concerns. First, plaintiffs had left early on numerous occasions without obtaining authorization from an Operating Manager. Second, they had failed to "respect the investigative process" by "call[ing] other supervisors to solicit statements from them." Aplt. App., Vol. II at 215, 217.

Massey's letters informed plaintiffs that UAL was taking the following actions against them. First, they would be removed from the FIT Team and returned to the shifts they were on prior to their participation in the Team. Second, they were to be placed on a ninety-day action plan. The letters warned them that "[f]ailure to successfully meet the expectations outlined in that action plan will lead to discipline up to and including discharge." *Id.* In addition, the Letters of Counsel would remain in plaintiffs' personnel files for five years and would have to be disclosed when they applied for other positions within UAL. When plaintiffs returned to work on January 23, 2006, they were paid in full for the time they were held out of service. After pursuing their administrative remedies with the Equal Employment Opportunity Commission (EEOC), they filed this suit.

## ANALYSIS

### 1. Bankruptcy Discharge

At the outset, we are confronted with UAL's argument that since all of plaintiffs' claims were discharged by the 2006 confirmation of its Chapter 11 bankruptcy in the Northern District of Illinois, the district court lacked subject-matter jurisdiction to entertain the claims on the merits.[3] Although

---

[3] Plaintiffs' claims appear to have accrued in large part subsequent to the filing of UAL's bankruptcy petition but prior to confirmation of its Chapter 11 Plan, and thus would properly be treated as an administrative expense of the

(continued...)

the parties devoted nearly 400 pages of district court briefing and exhibits to the bankruptcy discharge issue, the district court dismissed UAL's argument in a footnote, stating that it was not persuaded by the argument. It concluded that it had jurisdiction to address the merits of UAL's summary judgment motion. Aplt. App., Vol. XII at 1364 n.1.

In our view, the bankruptcy discharge issue is far from simple.[4] To begin with, it remains an open question whether such a discharge operates as a jurisdictional bar to suit or is merely an affirmative defense that can be waived.[5]

---

[3](...continued)
bankruptcy estate. *See In re U.S. Airways, Inc.*, 365 B.R. 624, 628 n.8 (Bankr. E.D. Va. 2007).

[4]      Plaintiffs assert that UAL cannot assert the bankruptcy discharge on appeal because it failed to cross-appeal from the district court's rejection of the defense. But the bankruptcy discharge, if jurisdictional, may be raised at any time, and if not jurisdictional, is simply an alternate ground for affirmance that did not require a cross-appeal. *See, e.g., Tinkler v. United States ex rel. FAA*, 982 F.2d 1456, 1461 n.4 (10th Cir. 1992).

[5]      *Compare Lone Star Sec. & Video, Inc. v. Gurrola (In re Gurrola)*, 328 B.R. 158, 164 (9th Cir. B.A.P. 2005) (stating that provision in 11 U.S.C. § 524(a) making judgments imposing personal liability on debtor with respect to a discharged debt "void" involves "a term of art . . . that equates with the concept of a nullity associated with lack of jurisdiction") *with Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 967-68 (7th Cir. 1996) (striking belated attempt to raise bankruptcy discharge defense, concluding that under Fed. R. Civ. P. 8(c), discharge in bankruptcy is affirmative defense that must be timely asserted or waived). It should be noted that the Supreme Court has recently adopted an amendment to Fed. R. Civ. P. 8, effective December 1, 2009, that eliminates discharge in bankruptcy as an affirmative defense that is waived if not raised. This amendment is consistent with § 524(a)(1), which voids any judgment on a discharged debt and enjoins any attempt to collect the debt, *whether or not the*

(continued...)

If the discharge is jurisdictional, fundamental adjudicative principles required the district court to resolve the discharge issue before proceeding to the merits of plaintiffs' Title VII claims. *See generally Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (holding federal court may not decide cause of action before resolving existence of Article III jurisdiction). To further complicate matters, even assuming that such a discharge was jurisdictional, factual issues remain concerning whether the discharge here applies to plaintiffs' claims. Plaintiffs contend that at least some of their claims accrued after the bankruptcy was confirmed and that they received inadequate notice of the confirmation, factors that could preclude application of the discharge to at least some of their claims.

Fortunately, we need not resolve these thorny issues. Even if UAL's bankruptcy discharge created a jurisdictional bar to plaintiffs' claims, an exception to the general rule that jurisdictional issues must be addressed before consideration of the merits allows us to affirm the decision of the district court. Under what has been called the "foreordained" exception, a court may rule that a party loses on the merits without first establishing jurisdiction if the merits have already been decided in the court's resolution of a claim over which it *did* have jurisdiction. *Starkey ex rel. A.B. v. Boulder County Soc. Servs.*, 569 F.3d 1244,

---

[5](...continued)
*debtor invokes the discharge.*

1259-61 (10th Cir. 2009) (citing *Steel Co.*, 523 U.S. at 98-100). In such cases, the court is "not producing an advisory opinion . . . . it is merely parroting a prior decision." *Id.* at 1260. As it turns out, due to the nature of the claims in plaintiffs' complaint, we may reach certain claims notwithstanding the bankruptcy discharge. Provided that the claims subject to the bankruptcy discharge depend on the same factual and legal predicates as those claims over which the federal courts unquestionably have jurisdiction, we may then dispose of the allegedly discharged claims as well.

In their complaint, plaintiffs asserted claims for both damages and equitable relief. Specifically, they sought the following forms of equitable relief: (1) a declaratory judgment declaring that UAL violated Title VII; (2) removal of disciplinary actions and notations from their files; and (3) promotion or a new job assignment. Dalvit's claims for promotion or a new job assignment and for removal of disciplinary actions from her UAL file have arguably been mooted by her departure from UAL.[6] All of Benjamin's equitable claims remain pending.

Claims for equitable relief are dischargeable under the bankruptcy code if they can be "reduced to a monetary obligation." *Ohio v. Kovacs*, 469 U.S. 274, 282 (1985). That is, such claims to be discharged must involve "a right to

---

[6] Dalvit presented no evidence that the ongoing existence of disciplinary actions and notations in her UAL file will have any adverse effect on her now that she has left UAL.

payment." 11 U.S.C. § 101(5). Included within a discharge are equitable claims that can be viably replaced with an alternative remedy involving a right to payment. *See generally Rederford v. US Airways, Inc.*, 586 F. Supp. 2d 47, 51-53 (D.R.I. 2008) (analyzing equitable claim for reinstatement under Americans With Disabilities Act and concluding claim involved right to payment and was thus discharged in defendant's bankruptcy). The reverse is also true: equitable remedies, such as a request for prospective injunctive relief, may survive the debtor's discharge if not reducible to a monetary obligation. *Kovacs*, 469 U.S. at 284-85.

Benjamin's claim for "removal of any and all disciplinary actions and notations in [her personnel] files," Aplt. App., Vol. I at 13, 29, has no monetary equivalent. We therefore conclude that at least one of Benjamin's equitably-based claims is justiciable, irrespective of UAL's bankruptcy discharge. We will proceed to adjudicate the summary judgment issues as to that claim. The results of that adjudication may then foreordain the fate of both plaintiffs' remaining claims, notwithstanding any unresolved issues concerning UAL's bankruptcy discharge, provided that the legal and factual issues we have resolved conclusively dispose of those involving their other claims.

### 2. Standard of Review

We review the district court's grant of summary judgment de novo, applying the same standard as the district court. *Pinkerton v. Colo. Dep't of*

-12-

*Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009). Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination, we "examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Pinkerton*, 563 F.3d at 1058 (citation omitted). "At this stage, [c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . .The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* (quotation omitted). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### 3. District Court's Striking of Plaintiffs' Summary Judgment Affidavits

In opposition to UAL's motion for summary judgment, plaintiffs submitted personal declarations replete with inadmissible hearsay and speculation. The district court granted UAL's motion to strike them, finding that they primarily contained cumulative information and conclusory, unsubstantiated statements. Generally, "a court will disregard only those portions of an affidavit that are inadmissible and consider the rest of it." *Casas Office Mach., Inc. v.*

*Mita Copystar Am., Inc.*, 42 F.3d 668, 682 (1st Cir. 1994). Here, however,

plaintiffs raised no issue concerning the district court's decision to strike their

declarations in their opening brief on appeal. We therefore consider the issue

waived, *see Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007), and

affirm the striking of plaintiffs' declarations in their entirety.

### 4. Claims Not Included in EEOC Charge

Before reaching the merits of Benjamin's equitably-based claim for

removal of disciplinary notations in her personnel file, we will address the district

court's dismissal of plaintiffs' claims based on alleged retaliation after their

reinstatement. "Exhaustion of administrative remedies is a jurisdictional

prerequisite to suit under Title VII." *Jones v. Runyon*, 91 F.3d 1398, 1399

(10th Cir. 1996).[7] "A plaintiff's claim in federal court is generally limited by the

scope of the administrative investigation that can reasonably be expected to

follow the charge of discrimination submitted to the EEOC." *Jones v. United*

*Parcel Serv., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007) (quotation omitted).

Under this rule, "each discrete incident of [retaliatory] treatment constitutes its

own unlawful employment practice for which administrative remedies must be

---

[7]     Because exhaustion is jurisdictional, we may determine the issue of
whether plaintiffs exhausted these claims without first determining whether these
claims would be barred by UAL's bankruptcy discharge. *See Ruhrgas AG v.
Marathon Oil Co.*, 526 U.S. 574, 578, 585 (1999) (stating there is "no unyielding
jurisdictional hierarchy" and federal courts may "choose among threshold grounds
for denying audience to a case on the merits.").

exhausted." *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (quotation omitted).

Prior to filing this lawsuit, each plaintiff filed a charge of discrimination and retaliation with the EEOC. These charges described the personal harm resulting from UAL's actions as follows:

> On December 28, 2005, I was suspended from my job as a ramp supervisor on special assignment and later removed from the special assignment as a punishment. I was then placed on probation, and later a disciplinary letter was placed in my file, which has the effect of continuing me on probation and affecting my employment for five years. In addition the company has docked our pay for leaving work early, treating us like an hourly non-exempt employee, but failed to pay overtime for working late, treating us like a salaried exempt employee. This difference in pay structure is a violation of the Fair Labor Standards Act [FLSA] and impacts females more than males.

Aplt. App., Vol. V at 501, 504.[8]

Plaintiffs complain of numerous adverse actions not described in their EEOC charge that allegedly occurred after they returned from suspension in January 2006. *See* Aplt. Opening Br. at 36-40. Although these actions were included in their first amended complaint, they did not exhaust their administrative remedies concerning these adverse actions prior to bringing the complaint.[9] The district court therefore properly concluded that it lacked

---

[8]    Plaintiffs do not pursue their FLSA claims in this appeal.

[9]    As the district court pointed out, plaintiff Dalvit filed a second charge of discrimination on or about September 21, 2007, subsequent to the filing of her complaint in this action. This charge asserted claims relating to constructive

(continued...)

-15-

jurisdiction to consider discrimination and/or retaliation claims based on these incidents.

### 5. *McDonnell-Douglas* Standard

We may now proceed to the adjudication under our de novo summary judgment standard of Benjamin's equitably-based discrimination and retaliation claims involving the notation placed in her personnel file. We analyze these claims using the familiar burden-shifting framework of *McDonnell Douglas Corp.*

---

[9](...continued)
discharge, but also included claims concerning harassment and denial of promotion leading up to the alleged constructive discharge. Aplt. App., Vol. V at 534. She received a "right to sue" letter from the EEOC on February 1, 2008, after UAL had filed its motion for summary judgment. She initially moved to amend her complaint to include a claim for constructive discharge, then dropped that effort and filed a separate action based on constructive discharge. Plaintiffs argue, nevertheless, that this belated exhaustion cured Dalvit's failure to obtain a right-to-sue letter on her post-suspension claims before filing this suit.

Some circuits hold that a party may "file an action prior to receiving [a] right to sue letter, provided there is not evidence showing that the premature filing precluded the [EEOC] from performing its administrative duties or that the defendant was prejudiced by such filing." *Edwards v. Occidental Chem. Corp.*, 892 F.2d 1442, 1445 n.1 (9th Cir. 1990) (emphasis added). In this circuit, however, exhaustion before the EEOC is considered jurisdictional. *See Jones*, 91 F.3d at 1399 & n.1. Where exhaustion is jurisdictionally required prior to bringing a claim, a party generally may not cure the jurisdictional defect by belatedly pursuing her administrative remedies. *Cf. McNeil v. United States*, 508 U.S. 106, 111-12 (1993) (determining that prematurity of unexhausted FTCA claim was not cured by subsequent exhaustion of administrative claim). Moreover, even if we were to permit post-hoc exhaustion, the district court here made a specific finding that permitting such a belated cure would prejudice UAL. Aplt. App., Vol. XII at 1390. Plaintiffs fail to demonstrate that this finding represents an abuse of discretion.

-16-

*v. Green*, 411 U.S. 792, 802-04 (1973). Under this framework, Benjamin had the burden of initially establishing a prima facie case of discrimination. *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1142 (10th Cir. 2009). To do this, she had to show that (1) she was a member of a protected class; (2) she suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).

Assuming Benjamin made her prima facie case, the burden then shifted to UAL to articulate a legitimate, non-discriminatory reason for its actions. *Turner*, 563 F.3d at 1142. If it did so, then the burden shifted back to Benjamin to show that UAL discriminated against her on the basis of her gender. *Id.* She could carry this burden by showing that UAL's legitimate, non-discriminatory reason was pretextual, i.e., unworthy of belief. *Id.*

The analysis for Benjamin's retaliation claim is similar, except for the elements of the prima facie case. To prove a prima facie case of retaliation, she had to show (1) that she engaged in protected activity, (2) that UAL took a material "adverse action" against her, and (3) that there was a causal connection between the protected activity and the adverse action. *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007).

### 6. Equitable Claim for Removal of Letter of Counsel

Benjamin contends that UAL discriminated and retaliated against her by placing a disciplinary Letter of Counsel in her personnel file. She contends that this action was discriminatory because men were not treated in the same way, and retaliatory because it was orchestrated by Mortimer, who had retaliatory animus against her because of her previous discrimination complaints.

#### a. Prima Facie Case

UAL contends that Benjamin has failed to make out a prima facie case of either discrimination or retaliation, because Letters of Counsel do not rise to the level of an "adverse employment action." The consequences of UAL's Letters of Counsel in general and those issued to plaintiffs in particular are hotly disputed and there is significant factual dispute in the record concerning their effect.

Benjamin claimed that such letters are "huge" with UAL. Aplt. App., Vol. I at 91 (depo. p. 241). They are used to weed out candidates for promotion or job change. The letters were discipline and would remain in plaintiffs' files for five years, poisoning their chances for advancement. Benjamin testified she was told that she would not be interviewed for jobs at UAL because of the disciplinary letter in her file. *Id.*, Vol. III at 364. Rhonda Patterson-Eachus, another supervisor at UAL, confirmed that the effect of the letters in plaintiffs' files was that they would have no further advancement at UAL under Mortimer's supervision.

Mortimer provided an entirely different perspective on the letters. He stated that he did not consider them a form of discipline. They would have no effect on an employee's career. Moreover, he opined that the effect of these particular letters was mitigated by the fact that they explicitly stated that there was no evidence that plaintiffs violated UAL's rules.

Jeanne Nelli from HR testified that a Letter of Counsel is not a form of discipline. Rather, it is designed to change behavior before discipline is imposed. In her affidavit, she stated that Letters of Counsel do not limit an individual's ability to be hired for other positions at UAL.

Although the facts are disputed, we will assume for summary judgment purposes that Benjamin has made out a prima facie case of discrimination and retaliation in connection with the placement of the Letter of Counsel in her file. We must next ask whether UAL has advanced a legitimate, non-discriminatory and non-retaliatory reason for the discipline it imposed.

### b. UAL's Legitimate Reasons

UAL's reasons are detailed in the Letter of Counsel. The Letter explains UAL's actions as follows:

(1) UAL met with Benjamin on December 28, 2005, "to collect information regarding discrepancies between the hours you recorded on your pay certification instruments and the electronic records of your arrivals and departures

-19-

at work." Aplt. App., Vol. II at 215. "At the end of that meeting you were held out of service pending an investigation." *Id.*

(2)  Massey conducted an investigation within the FIT Team, and concluded that there was insufficient information to support a violation of UAL's rule of conduct prohibiting falsification of company records or reports.

(3)  She also concluded, however, that Benjamin had shown questionable ability as a leader in the organization. She reached this conclusion for two reasons:

(a)  The electronic records of Benjamin's arrivals and departures showed that she had left work early on numerous occasions without authorization of an Operating Manager. "In fact, several members of management and frontline employees noticed your frequent absence and questioned your assignment and schedule." *Id.* Massey noted that even though Benjamin was on special assignment, she was responsible for notifying her manager when she left work early and for making up the hours.

(b)  Benjamin was notified that Massey's investigation was ongoing and that she would be contacting other supervisors. Massey concluded that Benjamin had "ignored my direction and you called other supervisors to solicit statements from them." *Id.*

(4)  Massey removed Benjamin from the FIT Team but retained her in a supervisory role. She placed her on the swing shift. She also stated that she

-20-

would be placed on a ninety-day action plan and that her "[f]ailure to successfully meet the expectations outlined in that action plan will lead to discipline up to and including discharge." *Id.*

### c. Benjamin's Pretext Arguments

UAL thus provided non-discriminatory, non-retaliatory reasons for its actions in the Letter Benjamin seeks to have removed from her files. Benjamin contends that these explanations are pretextual, however, for the following reasons:

### (1). Mortimer's Participation

First, and generally, Benjamin contends that Mortimer was openly sexist with female employees in general and personally angry with her for making allegations of discrimination with UAL's personnel department. His discriminatory and retaliatory animus, she claims, caused him to orchestrate the actions taken against her that are reflected in the Letter of Counsel.

The record does not bear out the contention that Mortimer orchestrated the adverse actions taken against Benjamin. The evidence shows, rather, that it was Massey who made most of the decisions of which she now complains. Benjamin attempts to use the fact that Massey often communicated her findings to Mortimer during the investigation, and sought his approval or authorization as well as that of other supervisors for the actions she proposed, to suggest that she was a sort of

puppet whose strings he pulled to mastermind her downfall. But the record does not support this theory.

Benjamin contends that Mortimer "triggered" the investigation into her working hours. But the uncontroverted evidence shows that Mortimer asked Nail to investigate only after Nail reported to him concerns from co-workers about plaintiffs' attendance. Benjamin also complains that Mortimer knew that Nail had no evidence of wrongdoing at the time Nail brought these concerns to him. But, as Mortimer explained, it was precisely the lack of hard evidence, coupled with Nail's expressions of concern, that prompted him to have Nail investigate and look at plaintiffs' badge histories, to determine the facts based on objective evidence.

After Mortimer brought it to Kyte's attention that there were individuals who were not working their full shifts, Kyte recommended to Mortimer that he employ another department manager to conduct the investigation. Kyte recommended Massey to conduct the investigation, because she was unbiased.[10] Mortimer followed Kyte's recommendation.

---

[10]  The evidence is in conflict concerning whether Kyte "recommended" or "selected" Massey. Kyte stated that he recommended Massey to conduct the investigation. Mortimer also stated that Kyte recommended Massey to him, but when asked who "selected" Massey, he said "Jim Kyte." Aplt. App., Vol. II at 167. On summary judgment review, we adopt the set of facts most favorable to Benjamin and assume that Kyte "recommended" rather than "selected" Massey.

Massey testified that it was her decision to send Benjamin home during the investigation.[11] Jeff Gill agreed to this. She also told Mortimer of her decision. She also informed Mortimer she was going to send Benjamin home without pay.[12] She conferred first with Gill "to make sure that we'd been consistent in the past with what we'd done with other management employees." *Id.*, Vol. VI at 599. The record thus makes it clear that it was Massey, not Mortimer, who decided to suspend Benjamin pending the investigation.[13]

Massey then conducted the investigation. Nail provided her with information about working hours and reporting requirements for the FIT Team. Mortimer was not involved in the investigation. At the close of her investigation, Massey determined that Benjamin would be brought back to work.

---

[11] Although Benjamin asserts that "Mortimer controlled every personnel action during his tenure in Denver" and that she "could not have been suspended without his approval," Aplt. Opening Br. at 44, the record evidence she cites for these conclusory contentions comes from Benjamin's stricken declaration.

[12] Benjamin contends that Massey "conferred with Mortimer when [the] plaintiffs were suspended." Aplt. Opening Br. at 44. She refers to Massey's deposition, which actually states "I *let Kevin Mortimer know* and I let Jim Kyte know" that she had decided to send Benjamin home. Aplt. App., Vol. VI at 600 (emphasis added). When asked in a follow-up question what Mortimer said when she informed him of this decision, Massey responded "[n]othing." *Id.*

[13] As proof of Mortimer's role in suspending Benjamin, she cites Rhonda Patterson-Eachus's statement that "Kevin Mortimer was a manager who very much ran the operation." Aplt. Opening Br. at 44 (quoting Aplt. App., Vol. IV at 388, (depo. p. 13)). But this statement was made in the context of his *knowledge* of the investigation of Benjamin's discrimination complaint, not his role in her suspension.

Massey drafted the Letters of Counsel and asked Mortimer to proofread them. He made no changes to the Letters.

It was Massey's suggestion, approved by Kyte, Gill, and Mortimer, to remove Benjamin from the FIT Team. While Kyte, Gill, and Mortimer approved or agreed with this course of action, she did not discuss the decision with Mortimer beforehand and he did not provide input about it.

Benjamin claims Mortimer placed her on a ninety-day action plan. But the evidence she cites shows only that Mortimer informed her new supervisor, Patterson-Eachus, that she would be placed on the plan. *Id.*, Vol. IV at 388 (depo. p. 8). It was Patterson-Eachus's responsibility to draw up the plan. Mortimer did not tell her what to put in it. *Id.* at 387-88 (depo. pp. 8-11). Although she gave it to Mortimer, he did not comment to her about it. *Id.* at 392 (depo. p. 27).[14]

Benjamin complains that it was Mortimer who told her that the Letters would stay in her file for five years. But the evidence shows that the five-year requirement was UAL's policy, not Mortimer's personal decision. *Id.*, Vol. IV at 450 (Jeanne Nelli depo. pp. 58-59).

---

[14] The evidence is in conflict concerning whether an action plan even existed. Mortimer told Dalvit that she would not be placed on a ninety-day action plan as stated in her Letter of Counsel, because he did not know how to write up such a plan, given that the Letter had found insufficient evidence to support a violation. Instead, he purportedly stated, the Letter would stand as the action plan.

Benjamin further asserts that it was Mortimer who decided that the Letter constituted a form of "discipline" and that she would have to disclose that she was "on discipline" when applying for other jobs at UAL. If Mortimer made such a statement to her, however, it was in contravention of UAL policy. *See* Aplt. App., Vol. VI at 589-90 (Nelli affidavit). Moreover, any actual denial of employment opportunities based on Mortimer's interpretation lies beyond the scope of Benjamin's EEOC complaint.

In sum, the evidence and reasonable inferences therefrom, taken in the light most favorable to Benjamin, fails to support her theory that Mortimer masterminded and instigated a campaign of discrimination and retaliation against her, culminating in the Letter of Counsel and the discipline imposed in it and in accordance with it. Benjamin's contention that Mortimer's involvement in the disciplinary process demonstrates pretext fails.

### (2). UAL's Decision to Suspend Benjamin

Benjamin next contends that her suspension was "groundless." Aplt. Opening Br. at 13. She claims that the parking lot arrival and departure records established that she had worked eighty hours every two weeks, and that this was all UAL required. She supports this contention with an out-of-context misreading of UAL's response to her EEOC charge. *See id.* (quoting Aplt. App., Vol. V at 509).

UAL's EEOC response states that UAL had "frequent reports" concerning Benjamin's absences, Aplt. App., Vol. V at 508, and that investigation by Massey established that she had left work early on numerous occasions but certified that she had worked full days, *see id.* Massey then began an investigation to determine whether Benjamin had in fact falsified company records. In the course of this investigation, Massey found that Benjamin's arrival and departure records indicated that she had left work early, while certifying that she had worked a full eight-hour day. As the investigation continued, Massey learned from FIT Team members that they "understood that work hours were 'flexible' in that on occasions when members of the team might work less than 8 1/2 hours per day, there would be other occasions [when] they would be required to work more than 8 1/2 hours per day, but the expectation was that team members worked at least 80 hours in a two week pay period." *Id.* at 509. Thus, the "80 hour" requirement came from Massey's interview of Team members and their understanding of the FIT Team requirements. Nothing in UAL's EEOC response, however, indicates that it was UAL's policy that Benjamin was free to work whatever schedule she liked, without notifying anyone, so long as she worked eighty hours in a pay period.

### (3). Length and Conditions of Suspension

As the Letter of Counsel notes, UAL suspended Benjamin on December 28, 2005 and she was not reinstated to duty until January 23, 2006. Benjamin argues that UAL kept her on suspension for the full four weeks because she complained about discrimination during the suspension. She further contends that UAL's justification, that it was conducting an investigation of her work hours during this time period, is pretextual because UAL knew from witnesses within a week that hours on the FIT Team were flexible and that she had therefore done nothing wrong. Benjamin contends that once Massey obtained this knowledge from the witnesses, she should have been immediately reinstated.

Benjamin's contention that the length of the suspension was retaliatory cannot survive summary judgment. First, she did not contend in the district court, or in her opening brief in this appeal, that Massey knew of her discrimination complaint to HR in Chicago during her suspension.[15] The district court specifically found that it was undisputed that Massey did not know of the discrimination complaint until this suit was filed. Aplt. App., Vol. XII

---

[15]    In her opening brief, Benjamin asserts, in passing, that she complained *to Massey* that she was being suspended because she was female, and that she knew of this complaint when she took subsequent adverse actions against her. Aplt. Opening Br. at 64 n.3. Therefore, Benjamin asserts, there is a sufficient connection between her complaint and Massey's actions to prove a prima facie case of retaliation separate and apart from retaliation based on the complaint to HR and without any involvement by Mortimer. Benjamin did not make this argument to the district court, and we do not consider it here.

at 1386 n.13. Benjamin does not challenge this finding in her opening brief in this court. It was Massey who chose when to bring her back from suspension, and Benjamin has failed to demonstrate that she had any reason to retaliate against her.[16]

Benjamin has also failed to show that UAL's explanation for the length of the suspension was pretextual. Regarding the three to four weeks it took to bring Benjamin back from suspension, Massey stated:

> I don't believe that that's a long period of time when you're trying to -- you're in a middle of a holiday season, you have different work schedules, and just reviewing all the facts and trying to do a complete investigation and reviewing everything with HR, I'm not sure that I agree that that's a long period of time.

Aplt. App., Vol. XII at 1235.

Massey conducted her investigation by speaking to UAL employees during the first week that Benjamin was on suspension. Between the time she finished these interviews, sometime during the first week of January 2006, and the time Benjamin was called in and presented with the Letter of Counsel, on January 18, 2006, only two weeks elapsed. During this time, Massey had to decide on the discipline to be imposed, consult with her superior Kyte and others involved, and draw up the Letter.

---

[16] If Massey was unaware of the discrimination complaint, Benjamin arguably does not even establish a prima facie case of retaliation, because she failed to show a causal connection between the protected activity and the adverse employment action. *See Jones*, 502 F.3d at 1195.

-28-

UAL's response to Benjamin's EEOC complaint further explains that "[u]ltimately, it was determined that there may have been some confusion regarding the FIT team members' schedules." *Id.*, Vol. V at 509. Benjamin fails to show that in a case involving such confusion and the employer's perceived need for a complete investigation, that the delay in returning her from suspension was so excessive that UAL's explanation should be considered a pretext for retaliation.

Benjamin also complains that she was singled out by being suspended without pay. But Massey testified that she specifically checked with UAL's human resources department to make sure that suspension without pay was consistent with UAL's usual practice. Benjamin fails to show that this explanation is unworthy of belief.

### (4). Massey's Decision Concerning Wrongdoing

Benjamin contends that since Massey ultimately found that she had committed no wrongdoing, the justifications UAL advanced for the discipline imposed on her in the Letter of Counsel are unworthy of belief. In her deposition, Massey testified that she had found no "indications or evidence of any wrongdoing" by Benjamin. *Id.*, Vol. IV at 419 (depo. p. 21).[17] Reading further in

---

[17] Benjamin further contends that she concluded that no discipline was appropriate, citing Aplt. App., Vol. IV at 421. But this statement was in explanation of why no "discipline" was *imposed. See id.* Obviously, "discipline"

(continued...)

-29-

her deposition, however, she explains that although Benjamin had not violated a rule or policy of UAL, UAL took action to remove her from the FIT Team because her actions called into doubt her "credibility" as a member of the Team. *Id.* at 421 (depo. p. 40).

Massey acted consistently with this understanding. She reinstated Benjamin to her employment as a supervisor and arranged for her to be paid for the time she had been suspended. The Letter of Counsel, *signed by Massey herself*, then explained that some additional actions would be taken against Benjamin because of her questionable conduct. Whether or not these actions seem warranted to a detached judicial observer is not the issue. "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City & County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (quotation omitted). Benjamin fails to show that Massey's understanding of "no wrongdoing" required her to avoid imposing the measures outlined in the Letter of Counsel. Her conclusion that Benjamin had not violated UAL's official rules or policies does not demonstrate that the reasons given for the further actions taken in the Letters of Counsel were pretextual.

---

[17](...continued)
meant something different to Massey than the sanctions set out in the Letter of Counsel, because she *did* find those appropriate and they *were* imposed on Benjamin.

### (5). Male Comparators

Benjamin contends that UAL's reasons are pretextual because similarly-situated male supervisors and FIT Team members did the same things for which she was sanctioned in the Letter of Counsel, without being punished as she was. The record does not bear out this claim, however.

Massey stated that she spoke with two male Team members, George Bellopatrick and Jeff Freitas. Each of them told her that he would sometimes work more or less hours in a day, but that his operating manager was informed of the hours he was working. The Letter of Counsel specifically censured Benjamin for not keeping her managers similarly advised of her schedule.[18] Benjamin claims she was not required to notify her supervisor of her working hours. But it is UAL's understanding of this requirement, not hers, that counts. She has not shown that UAL excused FIT Team members from communicating with their Operations Manager concerning their work schedules.

Benjamin has also failed to show that there were complaints from fellow employees about other male managers as there were about her, or that these other

---

[18] Nail also stated that he investigated and prepared spreadsheets concerning Bellopatrick and Freitas, but that these showed no discrepancies in hours as Benjamin's did. Aplt. App., Vol. II at 145-46. It is difficult to square this claim with Bellopatrick and Freitas's admission to Massey that they worked flexible hours while on the FIT Team, sometimes putting in less than a full day. *See id.*, Vol. IV at 418. In any event, we do not rely on Nail's conclusions as a basis for distinguishing Bellopatrick and Freitas from Benjamin.

managers missed a meeting at which they were scheduled to give a presentation, as Benjamin did. Benjamin makes broad-ranging claims about a variety of male supervisors who were allowed to go home early without changing their certifications, *see id.*, Vol. III at 347, but she fails to show that these men were similarly-situated to her: that is, that they had the same supervisor or were subject to the same standards involving performance evaluation and discipline. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

### (6). Benjamin's Failure to Respect the Investigative Process

One of the reasons given in the Letter of Counsel for disciplining Benjamin was that she contacted other supervisors during Massey's investigation and therefore failed to respect the investigative process. Benjamin contends this explanation is unworthy of belief. She cites her own deposition testimony to establish that (1) she did not sign a confidentiality agreement; (2) no one told her not to contact others; and (3) she thought she had been terminated rather than suspended and that it was permissible to contact her fellow employees because there was in effect no ongoing investigation. This evidence has value in showing pretext only to the extent that it tends to show that *Massey*'s statement that Benjamin failed to respect the investigative process is unworthy of belief. Benjamin's own, subjective beliefs about confidentiality are irrelevant.

-32-

While Benjamin was not asked to sign a confidentiality agreement, the Letter of Counsel did not admonish her for failure to adhere to the terms of such an agreement. Instead, it noted that Massey had "informed you that the investigation was ongoing and I would be contacting other Supervisors. Yet, you ignored my direction and you called other supervisors to solicit statements from them." Aplt. App., Vol. II at 215. In other words, Massey concluded that her instruction to Benjamin about the investigation should have forestalled her from interfering by conducting her own "investigation" and contacting the same supervisors with whom Massey intended to speak.

While Benjamin contends that she did not know whether there was an ongoing investigation, she does not specifically deny Massey's statement that she told Benjamin she would be contacting other supervisors. And there is evidence that Benjamin should have known that the investigation was ongoing. Plaintiff Dalvit admitted that Massey never told her that the investigation had been concluded. *Id.*, Vol. II at 123 (depo. p. 155). She did not recall Massey saying that she had come to any conclusions. *Id.* (depo. p. 156). Plaintiff Benjamin stated that she was told before she was sent home that "We'll get back to you." *Id.*, Vol. I at 96 (depo. p. 309). Plaintiff Dalvit was told she was being sent home "until further notice." *Id.*, Vol. II at 121 (depo. p. 143). While it would perhaps have been preferable for Massey to have been more clear with Benjamin

concerning the ongoing nature of the investigation, and even to have requested her to sign a confidentiality agreement, her failure to do so does not demonstrate pretext.

### d. Conclusion

Benjamin has failed to show that UAL's legitimate, stated reasons for the discipline imposed upon her were a pretext for either discrimination or retaliation. This being the case, she is not entitled to the equitable relief sought of removal of the Letters of Counsel from her file.

### 7. Effect on Remaining Claims

### a. Benjamin's Remaining Claims

In addition to the other forms of equitable relief Benjamin sought that are reducible to monetary terms and thus dischargeable in bankruptcy, she sought damages including

> all compensation, salary raises, normal performance reviews, back pay, equal pay, front pay and benefits that plaintiffs were denied because of defendant's acts and failures to act, in a sum to be determined by the court and jury; liquidated and compensatory damages, including for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life, in a sum to be determined by the court and jury; exemplary or punitive damages in a sum to be determined by the court and jury; legal fees, disbursements, expert fees, and costs of this action [and] all legal interest on sums awarded.

Aplt. App., Vol. VIII at 855-56.

-34-

Her remaining claims for legal and equitable relief damages fail, for the same reasons outlined above in relation to her claim for removal of the Letter of Counsel from her file. Simply put, UAL's legitimate reasons are the same and our holding with regard to her failure to show pretext for purposes of surviving UAL's summary judgment motion on the Letter of Counsel claim applies with the same force to each and every one of her other properly-exhausted claims, whether legal or equitable, and whether or not dischargeable in bankruptcy. The analysis and factual basis are essentially undistinguishable. For this reason, our disposition of the Letter of Counsel claim, over which we unquestionably have jurisdiction, foreordains the defeat of all of her other claims over which jurisdiction is uncertain. *See Starkey*, 569 F.3d at 1259-61. Thus, in affirming the district court's summary judgment disposition of these claims, we merely parrot our decision as to her Letter of Counsel claim rather than producing an advisory opinion. *Id.* at 1260.

### b. Dalvit's Claims

A careful review of plaintiffs' appellate briefs and the entire record on appeal, especially including plaintiffs' EEOC charges, their complaints, and the final pretrial order, demonstrates that Dalvit's legal and equitable claims are in essential terms identical in law and fact to Benjamin's. Dalvit's claims for removal of the disciplinary letter from her file and for promotion and a new job assignment at UAL have been mooted by her departure from UAL, and her claim

-35-

for conduct after suspension, up to and including constructive discharge, was not properly exhausted before the EEOC. But as to the remainder of her claims, which are before the court, the reasoning we have advanced above concerning Benjamin's claims applies to Dalvit's claims as well. For this reason, we may and do, without producing an advisory disposition but also without deciding whether UAL's bankruptcy discharge has barred Dalvit's claims for relief, affirm the district court's summary judgment on each of Dalvit's claims. *Cf. Carolina Cas. Ins. Co. v. Pinnacol Assurance*, 425 F.3d 921, 928 (10th Cir. 2005) (stating that where court has jurisdiction to "affirm the judgment against [one plaintiff] on a ground that would also require affirmance of the judgment against [a second plaintiff] . . . we can affirm the judgment against [the second plaintiff] without first determining [as *Steel Co.* requires] that he has Article III standing.").

The judgment of the district court is AFFIRMED.

Entered for the Court

Michael R. Murphy
Circuit Judge

-36-